UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
NEWARK VICINAGE

| | | |
|---|---|---|
| OPTIMIZERX CORPORATION, a Nevada Corporation, | : : : | |
| Plaintiff, | : : | Civil Action No.: |
| v. | : : | Hon. |
| PDR NETWORK, LLC, a Delaware Corporation, | : : : | |
| Defendant. | : : | |

## CIVIL ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

NOW COMES Plaintiff OPTIMIZERX CORPORATION, as and for its Complaint against Defendant PDR Network, LLC, hereby states as follows:

### Parties and Introduction

1.     Plaintiff OptimizeRx Corporation ("OPRx" or "OptimizeRx") is a corporation organized under the laws of the State of Nevada, with its principal place of business in the City of Rochester, County of Oakland, State of Michigan.

2.     PDR Network, LLC ("PDR") is a limited liability company organized and existing under Delaware law with its principal place of business at 5 Paragon Drive, Montvale, New Jersey 07645.

3.     Upon information and belief, on or about November 3, 2014, PDR Network merged with LDM Group, LLC; LDM Group, LLC is a Missouri limited liability company with its registered office at 12935 North Outer Forty, Suite 210, St. Louis, Missouri 63141, and with a principal place of business at 5 Paragon Drive, Montvale, New Jersey.  PDR Network is the corporate successor by merger of LDM Group, LLC.

4.    Upon information and belief, PDR is the corporate successor of LDM and, as a result, is bound by the terms of the various agreements referenced herein.

## Jurisdiction and Venue

5.    This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §1332(a) because this is a civil action between citizens of different states and the amount in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs.

6.    There is complete diversity between the parties because Plaintiff is organized under the laws of the State of Nevada and Defendant is organized under the laws of the State of Delaware.

## PDR Network-OptimizeRx Master Services Agreement

7.    Effective May 1, 2013, PDR and OPRx entered into an agreement entitled "Master Services Agreement" (sometimes referred to as "MSA").  See Exhibit A.

8.    As acknowledged in the Master Services Agreement, OPRx is the leading provider of sample and patient financial assistance programs and technology and has developed proprietary software which it sought to co-market and license to PDR via its own and PDR distribution channels.

9.    PDR purports to be a leading provider of pharmaceutical drug product information and services that it sought to co-market and license to OPRx via its own and OPRx's distribution channels.

10.    The Master Services Agreement requires that PDR and OPRx collaborate in the implementation of the integration of its various products and services. Specifically, the Agreement provides as follows:

> 11.2. <u>Implementation.</u> The parties shall mutually agree on the process, procedures, roles, responsibilities and business methodology to implement the integration of the PDRN and OptimizeRx Products.

See Exhibit A at paragraph 11.2.

11.    The Master Services Agreement contains various obligations that bound PDR to exclusivity with OPRx, particularly with respect to sampling and patient financial assistance programs.  Specifically, the Master Services Agreement provides as follows:

> 11.5. <u>Marketing.</u>
>
> <u>(c)</u>    <u>Restrictions.</u> Each party agrees that (i) PDRN shall, in all PDRN Distribution Channels for which it wishes to utilize an e-coupon solution, use the OptimizeRx eCoupon Solution exclusively for any eCoupon-related services on the terms provided in this Agreement including Schedule C, except to the extent that a PDRN Customer or PDRN EHR Partner does not wish to utilize the OptimizeRx eCoupon Solution and in such cases only, no fees shall be payable to OptimizeRx;
>
> *       *       *

See Exhibit A at paragraph 11.5.

12.    The Master Services Agreement had an initial term of two years (see Exhibit A at paragraph 6.1) and was renewable for successive one year time periods.

13.    During the initial term of the MSA, PDR violated the marketing exclusivity restrictions located at paragraph 11.5 of the Master Services Agreement.

14.    Specific instances of violation of the exclusivity provision of the Master Services Agreement include but are not limited to the following:

> (a)    Following its merger with LDM Group, LLC, PDR promoted eCoupon Solution to the exclusion of and in competition with OPRx; and
>
> (b)    Actively promoting its own eCoupon Solution within the PDR network to the exclusion of and in competition with OPRx.

15.     In a clear violation of the Master Services Agreement, PDR announced its merger with LDM Group on or about November 3, 2014, promoting its own eCoupon solution to the exclusion of and in competition with OPRx.

16.     LDM Group is actively involved in the marketing of eCoupons and agreed to implement the OptimizeRx eCoupon Solution through its Confidential Settlement Agreement with OPRx.

17.     Concurrent with the filing of the instant action, OPRx has initiated litigation against LDM Group in the United States District Court for the Eastern District of Missouri for the various contractual breaches of a Confidential Settlement Agreement with OPRx in addition to the tortious interference and civil conspiracy claims stated herein. (See Exhibit B which does not contain exhibits).

18.     PDR's conduct as detailed herein violates this exclusivity provision (see Exhibit A, MSA at ¶11.5(c)) and has caused OPRx damages in the form of lost revenue in an amount not less than $900,000.00 paid thus far to the merged entity, and loss of business valuation in an amount not less than $10 million, which continues to mount.

## COUNT I
## BREACH OF CONTRACT

19.     Plaintiff incorporates by reference the allegations contained in Paragraphs 1 through 18, as though set forth in full herein.

20.     PDR agreed to various terms consistent with the Master Services Agreement entered into with OPRx.

21.     PDR has refused to comply with the terms of the Master Services Agreement, specifically but not limited to:

(a)    Both merged parties have violated and continue to violate existing agreements with OPRx;

(b)    Misrepresenting and violating the MSA by informing pharmaceutical companies that OPRx and SampleMD programs would not be accepted in its network to divert business away from OPRx;

(c)    In contrast to above item (a), PDR has misrepresented to eRx, EMR/EHR platforms that SampleMD (OPRx) programs will be available through LDM/PDR, only to circumvent and exclude OPRx from directly or indirectly promoting programs through these platforms; and

(d)    LDM and the CEO of the merged entity have previously entered into agreements with OPRx and similarly refused to comply with the agreed terms. This continual pattern of non-compliance and misrepresentation has caused significant damage to OPRx in both instances.

22.    OPRx has duly performed all of the terms of its obligations with PDR, including but not limited to payment of hundreds of thousands of dollars in fees detailed in the Master Services Agreement.

23.    PDR failed and refused to perform on said agreements and has refused to honor the exclusivity provisions of the Master Services Agreement.

24.    PDR has enjoyed the benefits of Plaintiff's performance of its obligations pursuant to the Master Services Agreement and now refuses to cooperate with the integration necessary to implement the Agreement.

25.    PDR's breach of its obligations under the Master Services Agreement has resulted in damages to Plaintiff in the form of lost revenue in an amount not less than $900,000.00 paid thus far to the merged entity, and loss of business valuation in an amount not less than $10 million, which continues to mount.

## COUNT II
## TORTIOUS INTERFERENCE

26.    Plaintiff incorporates by reference the allegations contained in Paragraphs 1 through 25 as though fully set forth herein.

27.    OPRx had an existing and/or reasonable expectation of an economic benefit or advantage arising from its Master Services Agreement with PDR related to the sales of prescription discount services to customers and/or partners of PDR and its distribution network.

28.    PDR had knowledge of OPRx's expectancy.

29.    PDR wrongfully and intentionally interfered with such expectations by committing the following non-exhaustive list of unlawful acts:

(a)    Both merged parties have violated and continue to violate existing agreements with OPRx;

(b)    The merged entity Misrepresenting and violating the MSA by informing pharmaceutical companies that OPRx and SampleMD programs would not be accepted in its network to divert business away from OPRx;

(c)    In contrast to above item (a), PDR has misrepresented to eRx, EMR/EHR platforms that SampleMD (OPRx) programs will be available through LDM/PDR, only to circumvent and exclude OPRx from directly or indirectly promoting programs through these platforms; and

(d)    LDM and the CEO of the merged entity have previously entered into agreements with OPRx and similarly refused to comply with the agreed terms. This continual pattern of non-compliance and misrepresentation has caused significant damage to OPRx in both instances.

30.    It is reasonably probable that OPRx would have received an economic benefit in the form of increased revenue and business valuation in the absence of PDR's unlawful interference.

31.    As a result of PDR's interference, OPRx has suffered damages in the form of lost revenue in an amount not less than $900,000.00 paid thus far to the merged entity, and loss of business valuation in an amount not less than $10 million, which continues to mount..

## COUNT III
## CIVIL CONSPIRACY

32.    Plaintiff incorporates by reference the allegations contained in Paragraph 1 through 31 as though fully set forth herein.

33.    Defendant PDR entered into an agreement with LDM Group, LLC on or before November 3, 2014.

34.    PDR and LDM Group entered into such an agreement for purposes of committing an unlawful act, specifically the breach and/or violation of the PDR Master Services Agreement and/or the LDM Confidential Settlement Agreement.

35.    Both PDR and LDM Group took at least one overt act in furtherance of such agreement including but not limited to the merger of LDM Group into PDR on or about November 3, 2014.  Additional overt acts include, but are not limited to the following:

(a)    Both merged parties have violated and continue to violate existing agreements with OPRx;

(b)    The merged entity misrepresenting and violating the MSA by informing pharmaceutical companies that OPRx and SampleMD programs would not be accepted in its network to divert business away from OPRx;

(c)    In contrast to above item (a), PDR has misrepresented to eRx, EMR/EHR platforms that SampleMD (OPRx) programs will be available through LDM/PDR, only to circumvent and exclude OPRx from directly or indirectly promoting programs through these platforms; and

(d)  LDM and the CEO of the merged entity have previously entered into agreements with OPRx and similarly refused to comply with the agreed terms. This continual pattern of non-compliance and misrepresentation has caused significant damage to OPRx in both instances.

36.  OPRX has suffered damages in the form of lost revenue in an amount not less than $900,000.00 paid thus far to the merged entity, and loss of business valuation in an amount not less than $10 million, which continues to mount.

## REQUEST FOR RELIEF

**WHEREFORE,** Plaintiff requests that judgment be entered against Defendant as follows:

**(a)**  Damages which continue to mount including lost revenue of $900,000.00 and loss of business past and future in the amount of at least $10 million; or, in the alternative,

**(b)**  Specific performance of the terms of the Settlement Agreement; and

**(c)**  Appropriate injunctive relief for a time period equal to the original terms of the MSA to ensure:

i.  That PDR proceed in good faith to complete the necessary steps, including completion of the agreed integration, to enable OPRx to distribute its patient discounts within PDR's distribution channels.

ii.  That PDR accept all of OPRx's programs for promotion unless one of the exceptions set out in Paragraph 11.5(c) of the Master Services Agreement applies. If they are alleged to apply, PDR must give OPRx the full facts and information underlying the exception.

iii.  That PDR provide OPRx written notice for each customer and/or EHR partner that rejected or disapproved of the patient discount, if in fact they exist.

iv.  That PDR immediately cease and desist claiming that SampleMD or OPRx will not be accepted in the PDR

distribution channels and provide written documentation that this was communicated to all sales and marketing personnel.

v.     That PDR complete the integration of their platform with OPRx by a date to be determined by this Honorable Court.

vi.    That PDR facilitate the OPRx promotion within its distribution channels.

vii.   That PDR cooperate in good faith to the greatest extent feasible with OPRx's effort to integrate PDR's drug information and services promotional programs within OPRx's network.

**(d)**    Any other relief this Honorable Court deems equitable and just.

Respectfully submitted,

**SALMON, RICCHEZZA, SINGER & TURCHI, LLP**

By:    */s/ Zachary J. Ballard*
Zachary J. Ballard, Esquire
Jared T. Hay, Esquire
Tower Commons
123 Egg Harbor Road – Suite 406
Sewell, NJ 08080
(856) 354-8074
(856) 354-8075 (fax)
zballard@srstlaw.com
jhay@srstlaw.com

***Attorneys for Plaintiff,***
***OptimizeRx Corporation***

Of Counsel:
Joseph P. McGill (*pro hac vice pending*)
Foley, Baron, Metzger & Juip, PLLC
38777 Six Mile Road, Suite 300
Livonia, Michigan  48152
(734) 742-1825
Email:  jmcgill@fbmjlaw.com

PLAINTIFF:  OPTIMIZERX CORPORATION

BY:    ***/s/ Douglas P. Baker***
Chief Financial Officer for Plaintiff, OptimizeRX Corporation

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues and claims.

**SALMON, RICCHEZZA, SINGER & TURCHI, LLP**

By:     */s/ Zachary J. Ballard*
Zachary J. Ballard, Esquire
Jared T. Hay, Esquire
Tower Commons
123 Egg Harbor Road – Suite 406
Sewell, NJ 08080
(856) 354-8074
(856) 354-8075 (fax)
zballard@srstlaw.com
jhay@srstlaw.com

***Attorneys for Plaintiff,***
***OptimizeRx Corporation***


## CERTIFICATION PURSUANT TO LOCAL RULE 11.2

Pursuant to Local Rule of Civil Procedure 11.2, the undersigned hereby certifies that this action is related to a pending action in The United States District Court for the Eastern District of Missouri, Eastern Division, Case #: 4:15-cv-00501.

**SALMON, RICCHEZZA, SINGER & TURCHI, LLP**

By:     */s/ Zachary J. Ballard*
Zachary J. Ballard, Esquire
Jared T. Hay, Esquire
Tower Commons
123 Egg Harbor Road – Suite 406
Sewell, NJ 08080
(856) 354-8074
(856) 354-8075 (fax)
zballard@srstlaw.com
jhay@srstlaw.com

***Attorneys for Plaintiff,***
***OptimizeRx Corporation***

# EXHIBIT A

# PDRN/OPTIMIZERx
## MASTER SERVICES AGREEMENT

This Master Services Agreement (the "Agreement") is made as of May 1, 2013 (the "Effective Date") by and between OptimizeRx Corporation, a Nevada corporation with offices at 400 Water, Rochester, Michigan 48307 ("OptimizeRx") and PDR Network, LLC, a Delaware limited liability company with offices at 5 Paragon Drive, Montvale, NJ 07645 ("PDRN") (each a "party" and collectively the "parties").

## BACKGROUND

A.     OptimizeRx is a leading provider of sampling and patient financial assistance programs and technology and has developed proprietary software that it wishes to co-market with and license to PDRN via its own and PDRN's distribution channels;

B.     PDRN is a leading provider of pharmaceutical drug product information and services that it wishes to co-market with and license to OptimizeRx via its own and OptimizeRx's distribution channels; and

C.     The parties wish to engage in several partnership opportunities as further described in Schedule A to this Agreement.

NOW THEREFORE, in consideration of the mutual covenants and promises contained herein, the parties, intending to be legally bound, agree as follows:

## A G R E E M E N T

**1.     Condition Precedent.** Within thirty (30) days of the Effective Date, the parties agree to resolve any initial customer or target channel conflict through the Alliance Managers or this Agreement will terminate automatically unless extended by mutual agreement of the parties.

**2.     Definitions.** Capitalized terms shall have the meaning ascribed to them in this Section 1 or otherwise as set forth in this Agreement.

"Affiliate" means a person or entity which, directly or indirectly, owns or controls, is owned or is controlled by or is under common ownership or control with a party hereto, as indicated. As used herein, "control" means the power to, directly or indirectly, direct the management or affairs of an entity, and "own" or "ownership" means the beneficial ownership, directly or indirectly, of a majority or minority of the voting equity securities or other equivalent voting interests of the entity.

"Brand Features" of a party means such party's trademarks, trade names, service marks, service names, logos and other distinct brand elements, including logos, colors, fonts, and navigation bars, and the total appearance and impression formed by the combination, coordination, and interaction of such elements, that appear from time to time in such party's properties, ventures and services worldwide, together with any modifications to the foregoing made by such party during the term.

"End User Information" means the name, address, and such other relevant contact information of the Registered Private Label Solutions Members as may be reasonably necessary for OptimizeRx to enable Registered Private Label Solutions Members to use the Private Label Solutions.

"EHR" means an Electronic Health Records vendor.

"Intellectual Property Rights" means all rights in and to copyrights, trade secrets, patents, trademarks and similar rights of any type under the statutory or common laws of any governmental authority, domestic or foreign, including rights in and to all applications and registrations relating to any of the foregoing.

"Launch Date" means the date on which the Links to the Private Label Solutions are made available to and promoted to targeted customers via both parties' applications.

"Link" means a URL hidden behind a formatting option that may take the form of a colored or underlined item of text (such as a URL description), logo or image, "button" or graphic box, and which allows an end-user to automatically move directly to or between web pages, websites or within a web page.

"Link Content" means the materials, graphics, HTML, XML and any other browser-based content, data and other information made available for inclusion in the Link and related banner pursuant to the terms of this Agreement, including without limitation any content, advertisements, or information obtained or licensed from third parties.

"Net Revenue" shall be defined as the gross revenue received by the relevant party, net only of the revenue share for channel partners (i.e., EHRs/EMRs) from the relevant party, which sums shall be deemed to be, and capped at, 50% of the gross revenues for purposes of this Agreement. It is agreed that if a party agrees to provide a revenue share to its channel partner greater than 50% of the gross revenue, such party shall be solely responsible for the payment of the amounts above 50% of the gross revenues. It is further agreed that if a party agrees to provide a revenue share to its channel partner less than 50% of the gross revenue, such party shall be entitled to retain the difference between the actual sums paid 50% of the gross revenues.

"OptimizeRx API" means OptimizeRx's proprietary application programming interface which enables remote browser-based access to the OptimizeRx Solutions.

"OptimizeRx eCoupon Solution" shall mean the proprietary SampleMD solution which provides a platform that allows savings support to be offered to physicians within e-prescribing software, through a desktop application and other means, such that at the time a prescription is being written, a coupon support for the same prescription selected by the physician (as available), will be displayed and distributed with e-prescribing software and may contemporaneously be sent to the pharmacy.

"OptimizeRx Customers" shall mean those pharmaceutical brands listed on Confidential Exhibit B.

"OptimizeRx Distribution Channels" shall mean all of OptimizeRx's channels of distribution of goods or services including EHR and "downloadable" software either directly or via partnerships

"OptimizeRx EHR Partners" shall mean the EHR distribution partners that OptimizeRx has existing contractual relationships with as of the Effective Date, which shall be provided to PDRN within 5 days of the Effective Date and shall become Confidential Exhibit B to this Agreement, a form of which is attached hereto.

-2-

"OptimizeRx eScheduler Solution" shall mean proprietary technology to automate on-demand live chat and scheduling with manufacturing representatives.

"OptimizeRx Solutions" shall mean: the OptimizeRx eCoupon Solution and the OptimizeRx eScheduler Solution and any other mutually agreed upon services from OptimizeRx.

"OptimizeRx eRx Module" shall mean a patient financial assistance e-prescribing module that is integrated into the SMD EHR partners' e-prescribing modules that contains, among other functionality, a link to full prescribing information.

"Page" means a document on the Internet which may be viewed in its entirety without leaving the applicable distinct URL address.

"PDR BRIEF" shall mean PDRN's module that provides prescribers with prescribing tools and regulatory and product support messages (and embedded hyperlinks) embedded as part of an EHR's e-Rx system and elsewhere in an EHR System.

"PDR Search" shall mean PDRN's module that provides prescribers with a comprehensive drug information database discoverable via a "PDR Search" branded search box.

"PDR Solutions" shall mean PDR BRIEF and PDR Search and any other mutually agreed upon services from PDRN.

"PDRN Customers" shall mean those pharmaceutical brands listed on Confidential Exhibit A.

"PDRN Distribution Channels" shall mean all of PDRN's channels of distribution of goods or services including print distribution, email, fax, EHR, web distribution channels either directly or via partnerships.

"PDRN EHR Partners" shall mean the EHR distribution partners that PDRN has existing contractual relationships with as of the Effective Date, which shall be provided to OptimizeRx within 5 days of the Effective Date and shall become Confidential Exhibit A to this Agreement, a form of which is attached hereto .

"Private Label Solutions" means a version of the OptimizeRx Solutions integrated within the PDRN Solutions, and bearing the Brand Features of PDRN and to which Registered Members shall be provided the opportunity to obtain savings, educational support and other services offered by OptimizeRx.

"Registered Private Label Solutions Members" mean those Registered Members who have signed up to become registered Private Label Solutions members through the Private Label Solutions.

"Registered Members" mean those of the physician community, physician staff community and healthcare community that are registered users of the PDRN Solutions and other platform(s) application and as such have been designated a unique user identification.

"Registered Member Information" shall mean any and all information collected or maintained by PDRN concerning the Registered Members, including but not limited to User NPI number, specialty and state/zipcode.

-3-

**3.** **Services.**

    3.1.   Mutual Services. During the term of this Agreement, subject to the terms of a work order, statement of work or other similar document incorporated herein (individually, a "Statement of Work" or "SOW"), when agreed to by the parties or an Affiliate of the parties (as applicable pursuant to and as set forth in such Statement of Work), each party shall provide the services, including any deliverables set forth in such Statement of Work (the "Services"). When required by either party, the parties will in good faith negotiate additions or changes to the Services ("New Services"), which will be documented in writing and signed by the parties. The parties may amend the description of the Services at any time, which shall be documented by an amendment to this Agreement. New Services will be performed pursuant to the terms in this Agreement unless the parties agree otherwise in writing.

**4.** **Confidential Information.**

    4.1.   Confidentiality.

       (a)   Each party may have access to proprietary information of the other party which is conspicuously marked "Confidential," "Proprietary" or the like and/or which should reasonably be understood by the receiving party as being confidential or proprietary to the disclosing party, including but not limited to, documents, materials, reports, drawings, schematics, prototypes, models, devices or inventions, financial information, business plans, marketing information, sales plans, cost information, all of which are owned by such other party (hereafter, "Confidential Information"). Confidential Information also includes all data, documents, patient information, employee and payroll information and materials provided by a party, or acquired or leanrned by a party's files or documents or employees, representatives, agents or customers, or information integrated or stored in or output in any form from the Private Label Solutions.

       (b)   Confidential Information does not include any information that (i) is generally available to the public, (ii) was in the rightful possession or known by the receiving party prior to receipt from the disclosing party, (iii) was rightfully disclosed to the receiving party by a third party, or (iv) was independently developed without use of any Confidential Information of the disclosing party. The obligations set forth in this Section 4.1 shall not apply to the extent that the other party's Confidential Information is required to be disclosed by law or valid order of a court or other governmental authority; provided that the responding party agrees to deliver reasonable prompt notice to the other party and use commercially reasonable efforts to cooperate prior to any such disclosure and cooperates with such other party's attempt to obtain a protective order.

       (c)   Each party will use such level of efforts as it uses to protect its own Confidential Information, but no less than commercially reasonable efforts to maintain in confidence and to not disclose or disseminate to any third party, or use except as permitted herein, any Confidential Information of the other party for a period of seven (7) years after its receipt of such Confidential Information.

    4.2.   Remedy. Each party acknowledges that money damages alone would not be a sufficient remedy for any violation by it of provisions of this Agreement that address use of property of that party including disclosure of that party's Confidential Information, and that that party will be entitled (in addition to any other remedies which may be available) to seek specific performance and injunctive relief as remedies for any such violation or threatened violation.

-4-

5.      **Intellectual Property.**

5.1.      Ownership.  Each party shall maintain sole ownership of its respective proprietary intellectual property and all improvements, suggestions and modifications thereto regardless of who made them.

5.2.      By OptimizeRx.  OptimizeRx will have and retain full and exclusive right, title and ownership interest in and to: (a) OptimizeRx-owned documentation and other materials provided to PDRN; (b) the OptimizeRx Solutions, the OptimizeRx API, OptimizeRx Materials, OptimizeRx Link Content, all OptimizeRx trademarks (collectively, the "OptimizeRx Products"), and the Private Label Solutions and (c) any Intellectual Property Rights, improvements and modifications in and to any and each of the foregoing by OptimizeRx.

5.3.      By PDRN.  PDRN shall have and retain full and exclusive right, title and ownership interest in and to: (a) PDRN-owned documentation and other materials provided to OptimizeRx; (b) all Registered Member Information; (c) all PDRN trademarks, the PDRN Solutions and other platform(s) applications and the content therein and the PDRN Link Content; and (d) any Intellectual Property Rights, improvements and modifications in and to any of such materials and trademarks.

5.4.      Grant of License.  Subject to the terms and conditions of this Agreement, and for so long as it is in effect, (i) OptimizeRx hereby grants to PDRN a non-exclusive, non-transferable, non-assignable license (without the right to sublicense), under OptimizeRx's Intellectual Property Rights, to the OptimizeRx Solutions and Private Label Solutions solely in connection with the Private Label Solutions and the PDRN Solutions and other platform(s) applications, including access to the OptimizeRx API as provided herein; and (ii) PDRN grants to OptimizeRx a non-exclusive, non-transferable, non-assignable license to internally use and access the PDRN Solutions and other platform(s) applications solely for the purposes of connecting the OptimizeRx Solutions and the Private Label Solutions to the PDRN Solutions and other platform(s) applications and otherwise to the extent necessary for OptimizeRx to fulfill its obligations under this Agreement.

5.5.      Limitations.  Neither party shall reverse engineer, reformat, recast, disassemble or decompile any of the other party's applications, or otherwise attempt to reverse engineer the connection between the Private Label Solutions and the PDRN Solutions, and other platform(s).

5.6.      Reserved Rights.  Without limiting the foregoing, each party reserves all rights other than those expressly granted in this Agreement, and no licenses are granted except as expressly set forth herein.

6.      **Term and Termination.**

6.1.      Term.  This Agreement will become effective as of the Effective Date of this Agreement and, unless sooner terminated as provided herein, shall remain effective for a period of two (2) years (the "Term").  At the end of the Term, and any applicable renewal term(s), this Agreement shall automatically renew for successive one (1) year periods as to existing customers of the parties (for as long as the term of the programs and/or relevant agreements PDRN has with the PDRN EHR Partners) unless either party provides formal written notification to terminate the Agreement at the end of the applicable Term or renewal term on or before the date 90 days prior to the end of the applicable Term or renewal term.

-5-

6.2.    Termination; Third Party Services.

(a)    This Agreement may be terminated or any SOW in whole or in part at any time by either OptimizeRx or PDRN, effective immediately upon 60 days written notice to the other party, if the other party: (i) becomes insolvent; (ii) files a petition in bankruptcy; (iii) makes an assignment for the benefit of its creditors; (iv) breaches any of its material responsibilities or obligations under the Agreement which breach is not remedied within thirty (30) days from receipt of written notice of such breach; or (v) is merged, consolidated with or acquired by another entity, unless such entity assumes the obligations of this agreement in whole.  The failure to pay amounts owed under an SOW when due (with any applicable grace periods) shall be considered a material breach under the SOW.  Notwithstanding the foregoing, in no event shall the termination of any particular SOW be deemed to effect a termination of any other SOW or this Agreement as a whole, except as expressly indicated in the notice of termination, and in the event this Agreement is terminated and any SOW remains outstanding, the terms of the Agreement shall continue to apply until each party as completed its performance under the outstanding SOW.

(b)    This Agreement or any SOW may be terminated, with or without cause, at any time by either party upon ninety (90) days prior written notice to the other party, which shall specify any issues or complaints leading to the provision of such notice.  Upon such notice, the parties will use best efforts to attempt to reasonably resolve the notice as provided in Section 12.14; provided, however, that if no resolution is reached as provided therein, the Agreement will terminate 90 days after the date of first notice.

6.3.    Obligations upon Termination.  Upon expiration or termination of this Agreement or an individual SOW, and except as necessary for the ongoing obligations in Section 12.11: (a) each party shall return or, at the disclosing party's request destroy, the Confidential Information of the other party; and (b) all licenses granted herein shall terminate.  Notwithstanding any termination of this Agreement or SOW, all necessary terms of any existing SOW (and the applicable terms of the Agremeent), including payment terms as set forth in Exhibit C, shall survive solely to the extent necessary until the completion of any then current customer agreements in existence as of the effective date of termination.

6.4.    Non-Solicitation.  Additionally, each party agrees that, during the Term and for one (1) year thereafter, it will not offer employment as an employee or consultant to any of the other party's employees or consultants.  A person or entity shall be deemed to continue to be an employee or consultant of a party for a period of ninety (90) days following the date such employee or consultant is terminated or otherwise ceases to provide services to such party for any reason.  The foregoing does not prohibit employment as a result of general solicitation.

## 7.    Fees and Costs.

7.1.    Fees.  In consideration of OptimizeRx providing the OptimizeRx Services, PDRN will pay OptimizeRx the fees for the OptimizeRx Services pursuant to Schedule C.  In consideration for PDRN providing the PDRN Services, OptimizeRx will pay PDRN the fees for the PDRN Services pursuant to Schedule C.  Fees for New Services, if any, must be agreed upon in writing and signed by both parties.  Either party may withhold payments or deduct amounts in the event of good faith disputes regarding this Agreement or any other agreement between the parties.  The parties acknowledge and agree that the parties shall have no obligation to pay any fees for any Services until after acceptance of such Service.

7.2.    Costs.  Each party shall be solely responsible for paying its own costs related to this Agreement.

-6-

7.3.   Late Payment.  Any undisputed invoice thirty (30) days past due is subject to a late payment charge of one and one-half percent (1.5%) per month on the total undisputed amount outstanding, provided, however, that such late charge will only begin to accrue five (5) days after a party has received notice from such other party that such undisputed amount is overdue.

7.4.   Audit.  During the Term of this Agreement and for a period of twelve (12) months thereafter, each party agrees to keep books and records, solely as such books and records relate to work performed pursuant to this Agreement and the calculation of the revenue sharing amounts hereunder (which books and records shall be maintained on a consistent basis and substantially in accordance with generally accepted accounting principles), as necessary to substantiate payments and performance of marketing programs. Each party shall have access to such books and records of the other party for purposes of audit and audits shall be conducted at reasonable time upon reasonable prior written notice during normal business hours, and no more than once annually. All out of pocket costs to conduct such audits shall be the responsibilty of the party requesting the audit be performed.  If any amount is in dispute after such audit, the parties will agree to discuss and resolve within 30 days, with payment due no more than 30 days after such resolution is reached.  Any unresolved claims shall be subject to the dispute resolution provisions in Section 12.14 hereto.

8.   **Representations and Warranties.**

8.1.   By Each Party.  Each party represents and warrants to the other that: (a) such party has the full corporate right, power and authority to enter into this Agreement and to perform the acts required of it hereunder; (b) the execution of this Agreement by such party, and the performance by such party of its obligations and duties hereunder, do not and will not violate any agreement to which such party is a party or by which it is otherwise bound or any applicable laws or regulations; (c) when executed and delivered by such party, this Agreement will constitute the legal, valid and binding obligation of such party, enforceable against such party in accordance with its terms; and (d) all services performed under this Agreement shall be performed in a timely, competent and workmanlike manner which meets industry requirements. Each party warrants that it shall not sue the other party for actions authorized under this Agreement including the access to and use of the other party's Intellectual Property as permitted to fulfill its obligations under this Agreement.

8.2.   Performance.  OptimizeRx represents and warrants to PDRN that the Private Label Solutions: (i) shall substantially conform to its documentation and Business Requirements Document; (ii) will not contain any viruses, Trojan horses, trap doors, back doors, worms, time bombs, cancelbots or other computer programming routines that are intended to damage, detrimentally interfere with, provide access to, surreptitiously intercept or expropriate any system, data or personal information; (iii) shall not knowingly infringe any third party's Intellectual Property rights, taking into account any licenses granted or obtained; and (iv) shall comply with the SLAs and support described in Schedule D, a draft of which is attached hereto.  The parties shall agree on a definitive Schedule D within 30 days of the execution date of this Agreement.

8.3.   No Additional Warranties.  EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, NEITHER PARTY MAKES, AND EACH PARTY HEREBY SPECIFICALLY DISCLAIMS, ANY REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, REGARDING THE PARTIES RESPECTIVE LINK CONTENT, WEB SITES, THE PLATFORM, THE SOLUTIONS OR PRODUCTS MARKETED ON SUCH WEB SITES, INCLUDING ANY IMPLIED WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR NONINFRINGEMENT.

**9.**  **Indemnification.**

9.1.  <u>Indemnification by PDRN</u>.  PDRN agrees to defend, indemnify and hold harmless OptimizeRx, and its Affiliates, employees, agents, representatives and third-party outsourced service providers (collectively, the "OptimizeRx Indemnified Parties") against all costs and expenses of the OptimizeRx Indemnified Parties (including reasonable attorneys' fees) arising from or in connection with a third party claim or demand against the OptimizeRx Indemnified Parties and all damages of the OptimizeRx Indemnified Parties arising from or in connection with such third party claim or demand arising from any of the following:  (1) any negligent acts, omissions, or willful misconduct attributable to PDRN; (2) any breach of this Agreement by PDRN or any of the PDR EHR Partners; (3) violation of any applicable law, statute or regulation attributable to PDRN; (4) any alleged infringement of the PDRN trademarks, the PDRN Solutions and other platform(s) of any third party's Intellectual Property Rights; or (5) any death, bodily injury or property damage caused by or otherwise attributable to PDRN.

9.2.  <u>Indemnification by OptimizeRx</u>.  OptimizeRx agrees to defend, indemnify and hold harmless PDRN, and its Affiliates, employees, agents, representatives and third-party outsourced service providers (collectively, the "PDRN Indemnified Parties") against all costs and expenses of the PDRN Indemnified Parties (including reasonable attorneys' fees) arising from or in connection with a third party claim or demand against the PDRN Indemnified Parties and all damages of the PDRN Indemnified Parties arising from or in connection with such third party claim or demand arising from any of the following:  (1) any negligent acts, omissions, or willful misconduct attributable to OptimizeRx; (2) any breach of this Agreement by OptimizeRx or any of its Affiliates; (3) violation of any applicable law, statute or regulation attributable to OptimizeRx; (4) any alleged infringement of the OptimizeRx Products of any third party's Intellectual Property Rights; or (5) any death, bodily injury or property damage caused by or otherwise attributable to OptimizeRx.

9.3.  <u>Exclusions</u>.  The parties obligations under this <u>Section 9</u> do not apply to any claim based on:  (a) a use of other than the current version of their respective products, if the infringement would have been avoided by use of the current version; (b) modification of the products not approved by the product owner; (c) the combination or use of the products with other products except linked as mutually agreed by the parties.  THIS SECTION STATES THE SOLE LIABILITY OF THE PRODUCT OWNER WITH RESPECT TO ANY INFRINGEMENT BY THE PRODUCTS OF ANY PATENT, COPYRIGHT, TRADE SECRET, TRADEMARK OR OTHER INTELLECTUAL PROPERTY CLAIM.

**10.**  **Limitation of Liability.**

10.1.  UNDER NO CIRCUMSTANCES WILL EITHER PARTY BE LIABLE TO THE OTHER PARTY FOR INDIRECT, INCIDENTAL, CONSEQUENTIAL, SPECIAL OR EXEMPLARY DAMAGES (EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES), ARISING FROM ANY PROVISION OF THIS AGREEMENT, SUCH AS, BUT NOT LIMITED TO, LOSS OF REVENUE OR ANTICIPATED PROFITS OR LOST BUSINESS.

10.2.  IN NO EVENT WILL EITHER PARTY'S LIABILITY FOR ANY ACTION ARISING OUT OF THIS AGREEMENT EXCEED THE TOTAL AMOUNTS RECEIVED BY SUCH PARTY FROM THE OTHER PARTY UNDER THIS AGREEMENT.

10.3.  THE LIMITATIONS IN THIS <u>SECTION 10</u> SHALL NOT APPLY SHOULD EITHER PARTY'S LIABILITY TO THE OTHER ARISE UNDER <u>SECTION 4</u>, CONFIDENTIAL INFORMATION; <u>SECTION 9</u>, INDEMNIFICATION; GROSS NEGLIGENCE OR WILLFUL MISCONDUCT; OR FAILURE TO COMPLY WITH LAWS. THESE LIMITATIONS SHALL APPLY NOTWITHSTANDING ANY FAILURE OF ESSENTIAL PURPOSE OR ANY LIMITED REMEDY.

-8-

10.4.    Neither party assumes any liability or responsibility: (i) for ensuring that Registered Members have the ability to prescribe and/or dispense pharmaceutical products and (ii) for any misrepresentation, act or omission by a Registered Member.

**11.    General Obligations of the Parties.**

11.1.    Alliance Manager. Each party will designate a project manager ("Alliance Manager"), to be the primary ongoing liaisons between the parties for purposes of this Agreement. Each party may change the Alliance Manager upon five (5) business days' prior written notice to the other party.

11.2.    Implementation. The parties shall mutually agree on the process, procedures, roles, responsibilities and business methodology to implement the integration of the PDRN and OptimizeRx Products.

11.3.    Hosting. Each party shall be responsible for hosting the Private Label Solutions in accordance with the Business Requirements Document, the SOWs and this Agreement. Each party shall provide updates, improvements, modifications, enhancements, or corrections to the Private Label Solutions, as such are made generally available to the other party's licensees. The Private Label Solutions and all data shall not be hosted by or stored on servers located outside the United States without the prior written approval of both parties. Both parties have, and shall maintain throughout the Term, a hosting environment in compliance with SSAE 16 and currently have, and will maintain throughout the Term, business continuity and disaster recovery plans.

11.4.    Business Requirement Document. Promptly following the date of each of the SOWs, the parties shall agree to the terms of, and execute, a business requirements document describing the technical implementation and performance requirements for such SOW, including refining the hosting terms and service level agreements herein, (the "Business Requirement Document").

11.5.    Marketing.

(a)    Marketing of Private Label Solutions. OptimizeRx and PDRN shall use commercially reasonable efforts to market and promote each other's products to customers or prospective customers; provided, however, that no provision in this Agreement shall operate to limit either party's ability to market and promote its offerings independent of the obligations of this Agreement.

(b)    Channel Conflict. The Alliance Managers shall be responsible for resolving any new customer or target channel conflicts during the term of this Agreement. To the extent the Alliance Managers cannot resolve the conflict within five (5) business days, the issue will be escalated for resolution as described in Section 12.14 of the Agreement.

(c)    Restrictions. Each party agrees that (i) PDRN shall, in all PDRN Distribution Channels for which it wishes to utilize an e-coupon solution, use the OptimizeRx eCoupon Solution exclusively for any eCoupon-related services on the terms provided in this Agreement including Schedule C, except to the extent that a PDRN Customer or PDRN EHR Partner does not wish to utilize the OptimizeRx eCoupon Solution and in such cases only, no fees shall be payable to OptimizeRx; and (ii) OptimizeRx shall not, during the Term and for one year after, directly market or provide the OptimizeRx eCoupon Solution to any PDRN EHR Partner (which was not also an OptimizeRx EHR Partner as of the Effective Date) who has fully integrated the OptimizeRx eCoupon Solution within such PDRN EHR Partner's eprescribe workflow other than as mutually agreed by the parties.

-9-

11.6. <u>Training</u>.

(a)     OptimizeRx agrees to provide sales training and technical training to PDRN marketing personnel at least 5 days prior to the Launch Date and continuing sales consultation as mutually agreed by the parties with respect to the OptimizeRx Solutions and Private Label Solutions.

(b)     PDRN agrees to provide sales training and technical training to OptimizeRx marketing personnel at least 5 days prior to the Launch Date and continuing sales consultation as mutually agreed by the parties with respect to the PDRN Solution and Private Label Solutions.

(c)     Each party shall be responsible for its own travel and other expenses related to attending any in-person training sessions.

11.7.     <u>Quarterly Review</u>.  The Alliance Managers and a designated representative of each of the parties shall meet, in person or via a conference call, a minimum of once each calendar quarter to: (i) review program performance, user activity and satisfaction with respect to the Private LabelSolutions and (ii) discuss new opportunities to enhance the Private Label Solutions and user experience.

11.8.     <u>Reporting</u>.  Each of PDRN and OptimizeRx shall make available to the other party and its clients the best available reporting tools and solutions then available to its own clients, and shall update those solutions symmetrically during the Term with the minimum requirements as set in Scheduale B.

11.9.     <u>"Med-Reg-Legal" Assistance</u>.  In the case of any joint or coordinated programs, the parties agree to cooperate to provide all necessary information and undertake all necessary steps to complete any necessary medical, legal and regulatory review to effectuate such joint or coordinated programs.

11.10.     <u>Compliance with Laws and Industry Guidelines</u>.  Each party agrees that it shall comply with all applicable federal, state and local laws and regulations in performance of its respective obligations pursuant to this Agreement, including, without limitation, laws related to fraud, abuse, privacy, discrimination, disabilities, samples, confidentiality, false claims and prohibition of kickbacks. Without limiting the generality of the foregoing:

(a)     The parties acknowledge that the parties conduct its relationships with healthcare professionals in compliance with applicable laws (including, without limitation, 42 C.F.R. §1001.952(d), the "safe harbor" to the U.S. Anti-Kickback Statute, 42 U.S.C. §1320a-7(b), with respect to personal services) and the PhRMA Code on Interactions with Healthcare Professionals (the "<u>PhRMA Code</u>") promulgated by the Pharmaceutical Research and Manufacturers of America (PhRMA).  Each party, in the performance of its Services under this Agreement, shall conduct its relationships with healthcare professionals (and, to the extent applicable, shall cause its employees and subcontractors to conduct their relationships with healthcare professionals) in accordance with all applicable laws and the PhRMA Code.

(b)     The parties agree to comply with all applicable federal, state and local laws and regulations relating to the privacy of patient health information, including, but not limited to, the Standards for Individually Identifiable Health Information, 45 C.F.R. §§160 and 164 (the "<u>HIPAA Privacy Regulation</u>") promulgated pursuant to the Health Insurance Portability and Accountability Act of 1996.  If either party deems it necessary in the performance of its duties under this Agreement to disclose to the other party the "Protected Health Information" (as such term is used in the HIPAA Privacy Regulation) of a patient, then, in advance of any such disclosure, the disclosing party shall obtain a written authorization executed by such patient for the use and disclosure of such Protected Health Information in accordance with the HIPAA Privacy Regulation.

-10-

(c)     As a federal contractors, the parties are required to incorporate into this Agreement by reference the provisions of certain federal rules and executive orders relating to equal employment opportunities and the notification of employees of their rights concerning the payment of union dues or fees. In furtherance thereof: (i) the provisions of 29 C.F.R. §470, 41 C.F.R. §60-250.5(a); 41 C.F.R. §60-741.5(a) are incorporated herein by reference; and (ii) the parties must abide by the non-segregation regulations at 41 C.F.R. §60-1.8 and any applicable affirmative action obligations as required by 41 C.F.R. §60-1.40(a)(2).

11.11.   Debarment.  The parties represent and warrant that after due inquiry:

(a)     such party or, to the extent applicable, any employee of such party, subcontractor or employee of a subcontractor has not been debarred by the Food and Drug Administration (the "FDA") pursuant to its authority under Sections 306(a) and (b) of the U.S. Food, Drug and Cosmetic Act (21 U.S.C. §335(a) and (b)) or is the subject of any investigation or proceeding which may result in debarment by the FDA; and

(b)     such party or, to the extent applicable, any employee of such party, subcontractor or employee of a subcontractor is not included in the List of Excluded Individuals/Entities (maintained by the U.S. Department of Health and Human Services Office of Inspector General) or the List of Parties Excluded from Federal Procurement and Non-procurement maintained by the U.S. General Services Administration, or is the subject of any investigation or proceeding which may result in inclusion in any such list.

11.12.   No Inducement.  The Services requested by, and to be performed for, each party represent bona fide services and under no circumstances is the requisition of such Services or the remuneration therefore, meant to serve as an obligation, express or implied, to purchase, prescribe or otherwise support such party's products.

## 12.     Miscellaneous.

12.1.   Notices.  Any notice or other communication to be given hereunder will be in writing and given by facsimile, express receipted courier or overnight mail, postpaid registered or certified mail return receipt requested, or electronic mail (with a copy concurrently mailed as set forth above).  The date of receipt shall be deemed the date on which such notice is given.  Notice hereunder will be directed to a party at the address for such party set forth in the first paragraph of this Agreement.

12.2.   Assignment.  Neither party will transfer or assign any rights or delegate any obligations hereunder, in whole or in part, whether voluntarily or by operation of law, without the prior written consent of the other party.  Any purported transfer, assignment or delegation by either party without the appropriate prior written approval will be null and void and of no force or effect.  Notwithstanding the foregoing, each party will have the right to assign this Agreement to any wholly-owned subsidiary, or any successor of such party by way of merger or consolidation or the acquisition of all or substantially all of the business and assets of the assigning party relating to the Agreement.

12.3.   Publicity.  Each party shall have the right to use the other party's name or reference the other party in advertising, publicity releases or publicly distributed materials only with the prior written consent of the other party, including but not limited to references on websites upon approval from other party.  Each such approval will include what use of any trademarks or other marketing indicia are acceptable or not acceptable.

-11-

12.4.   Headings. Sections, titles or captions in no way define, limit, extend or describe the scope of this Agreement nor the intent of any of its provisions.

12.5.   Severability. Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction will, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining portions hereof or affecting the validity or enforceability of such provision in any other jurisdiction.

12.6.   Entire Agreement. This Agreement together with its Schedules and Exhibits contains the entire agreement of the parties with respect to the subject matter hereof, and supersedes all prior and/or contemporaneous agreements or understandings, written or oral, between the parties with respect to the subject matter hereof; including, without limitation, that certain termsheet between the parties dated February 20, 2013.

12.7.   Governing Law/Venue. The validity, interpretation, and performance of this Agreement shall be controlled by and construed under the laws of the State of New Jersey, United States of America, as if performed wholly within New Jersey and without giving effect to the principles of conflicts of laws. The Parties hereto irrevocably agree to the exclusive jurisdiction of the federal and state courts located in Newark, New Jersey.

12.8.   Amendment. This Agreement may not be amended or modified by the parties in any manner, except by an instrument in writing signed on behalf of each of the parties to which such amendment or modification applies by a duly authorized officer or representative.

12.9.   Waiver. Any of the provisions of this Agreement may be waived by the party entitled to the benefit thereof. Neither party will be deemed, by any act or omission, to have waived any of its rights or remedies hereunder unless such waiver is in writing and signed by the waiving party, and then only to the extent specifically set forth in such writing. A waiver with reference to one event will not be construed as continuing or as a bar to or waiver of any right or remedy as to a subsequent event.

12.10.   Force Majeure. Neither party shall be responsible for failure to perform the terms of this Agreement when performance is prevented by force majeure provided that: (1) notice and reasonably full details of the force majeure are given to the other party; and (2) that the effects of such force majeure are mitigated so far as possible with commercially reasonable efforts. The term "force majeure" shall mean acts of God, earthquakes, fire, flood, war, civil disturbances, governmentally imposed rules, regulations or moratoriums, or any similar causes not within the reasonable control of either party which through the exercise of due diligence, a party is unable to foresee or mitigate. In no event shall the term force majeure include normal or reasonably foreseeable or reasonably avoidable operational delays.

12.11.   Survival. Sections 4.1, 6.3, 6.4, 7.4, 9, 10, 11.5(c)(ii) and 12.14 shall survive any expiration or termination of this Agreement.

12.12.   Counterparts. This Agreement may be executed in any number of counterparts with the same effect as if both parties hereto had signed the same document. All counterparts will be construed together and will constitute one agreement.

12.13.   Compliance with Laws. Each party shall comply fully with all applicable laws, rules, regulations and best industry practices, including, without limitation, those relating to privacy, data security, online advertising and unfair or deceptive trade practices.

418161987 v2

12.14.  Dispute Resolution.  In the event that a dispute arises between the parties which cannot be resolved in the normal course, then within ten (10) business days of a written request by either party, the Chief Executive Officers or designated officers of both parties shall meet to resolve the issue.  If the Chief Executive Officers or designated officers of the parties cannot resolve the issue within ten (10) business days, then the parties may exercise other rights and remedies available under this Agreement and at law or in equity, including, but not limited to termination of this Agreement or any SOW.

12.15.  Third Party Beneficiaries.  No person or entity not a party hereto will be deemed to be a third party beneficiary of this Agreement or any provision hereof.

12.16.  Insurance.  Each party shall maintain, commencing on the Effective Date for the term of this Agreement, a Commercial General Liability Insurance policy or policies (including coverage for Product Liability, Contractual Liability, Errors and Omissions, Bodily Injury, Property Damage and Personal Injury), with minimum limits of $2,000,000 general aggregate/$8,000,000 umbrella.

12.17.  Subcontracting.  Neither party shall have the right to, and shall not, subcontract all or any part of its responsibilities, as set forth in this Agreement, without the prior written consent of the other party.

*[Signature Page Follows]*

818161987 v2

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective duly authorized officers or representatives as of the Effective Date.

**OPTIMIZERX CORPORATION,**

By: _____

Name: _Shad L. Stastny_

Title: _Chief Executive Officer_

**PDR NETWORK, LLC**

By: _____

Name: _Andrew Gelman_

Title: _SVP & General Counsel_

## SCHEDULE A

### Statements of Work

The parties agree to provide services to each other over the Term of this Agreement as specified in the following Sub Schedules herein and as mutually agreed by the parties:

Schedule A-1:  PDRN's marketing of OptimizeRx Products in PDRN Distribution Channel and/or the OptimizeRx Distribution Channel

Schedule A-2:  OptimizeRx's marketing of PDRN Products in the OptimizeRx Distribution Channel and/or the PDRN Distribution Channel

## SCHEDULE A-1

### PDRN's Selling of OptimizeRx Products

The parties desire that PDRN serve as a sales agent for certain mutually approved OptimizeRx Products including the OptimizeRx eCoupon Solution and the OptimizeRx eScheduler Solution.

On mutually agreeable terms and on mutually agreeable pricing, PDRN may sell, either alone or with the participation of OptimizeRx, programs to its customers that will be executed and delivered either in the network of PDRN EHR Partners and/or in the network of OptimizeRx EHR Partners.

The obligations of the parties to provide that solution are more specifically identified below:

**I.     Summary and General Obligations of the Parties.**

1. The parties hereby agree to collaborate to allow PDRN to serve as a sales agent for certain mutually approved OptimizeRx Products as set forth in this SOW.

2. Business Requirements. The parties shall, in a timely fashion, develop a mutually acceptable Business Requirements Document within thirty (30) days from the Effective Date and execute against the same.

3. Fees. Fees shall be as set forth in Schedule C to the Agreement.

4. Launch Date. The parties currently estimate that the Launch Date for this SOW will be as soon as practicable utilizing commercially reasonable efforts acting diligently, and the parties hereto will use their respective commercially reasonable efforts to achieve a Launch Date no later than May 30, 2013.

**II.    OptimizeRx's Obligations.**

OptimizeRx shall have the following obligations during the Term of this Agreement:

1. Continue to offer its OptimizeRx eCoupon Solution and the OptimizeRx eScheduler Solution in no less a complete manner as offered at the Effective Date in its entire network of OptimizeRx EHR Partners.

2. Provide reasonable pricing for its OptimizeRx eCoupon Solution and the OptimizeRx eScheduler Solution and the terms of service pursuant to the Business Requirements Document and Confidential Exhibit B;

3. performing other obligations as contemplated by this Agreement; and

4. provide access to PDRN to reporting of utilization of selected offers and redemptions generated by the PDRN Solutions, and other platform(s).

**III.    PDRN's Obligations:**

PDRN shall have the following obligations during the Term of this Agreement:

1.  promoting and using commercially reasonable efforts to negotiate and execute contracts with pharmaceutical manufacturers whereby pharmaceutical manufacturers will contract with PDRN to have their coupons be made available at mutually agreed upon pricing.

## SCHEDULE A-2

### OptimizeRx's Selling of PDRN Products

The parties desire that OptimizeRx serve as a sales agent for certain mutually approved PDRN Solutions.

On mutually agreeable terms and on mutually agreeable pricing to mutually pre-approved OptimizeRx Customers, OptimizeRx may sell, either alone or with the participation of PDRN, programs to its customers that will be executed and delivered either in the network of PDRN EHR Partners and/or in the network of OptimizeRx EHR Partners.

The obligations of the parties to provide that solution are more specifically identified below:

**I.     Summary and General Obligations of the Parties.**

1. The parties hereby agree to collaborate to allow OptimizeRx to serve as a sales agent for certain mutually approved PDRN Solutions as set forth in this SOW.

2. <u>Business Requirements</u>. The parties shall, in a timely fashion, develop a mutually acceptable Business Requirements Document within thirty (30) days from the Effective Date and execute against the same.

3. <u>Fees</u>. Fees shall be as set forth in <u>Schedule C</u> to the Agreement.

4. <u>Launch Date</u>. The parties currently estimate that the Launch Date for this SOW will be as soon as practicable utilizing commercially reasonable efforts acting diligently, and the parties hereto will use their respective commercially reasonable efforts to achieve a Launch Date no later than May 30, 2013.

**II.    PDRN's Obligations.**

PDRN shall have the following obligations during the Term of this Agreement:

1. Continue to offer its PDRN Solutions in no less a complete manner as offered at the Effective Date in its entire network of PDRN EHR Partners.

2. Provide reasonable pricing for its PDRN Solutions and the terms of service pursuant to the Business Requirements Document and <u>Confidential Exhibit A</u>;

3. Performing other obligations as contemplated by this Agreement; and

4. Provide access to OptimizeRx to reporting of utilization of selected programs generated by the PDRN Solutions, and other platform(s).

**III.** **OptimizeRx's Obligations:**

OptimizeRx shall have the following obligations during the Term of this Agreement:

1. Promoting and using commercially reasonable efforts to negotiate and execute contracts with pharmaceutical manufacturers whereby pharmaceutical manufacturers will contract with OptimizeRx to have their content be made available at mutually agreed upon pricing.

## SCHEDULE B

### Minimum Reporting Requirements

OptimizeRx will provide the following monthly data for each eCoupon program:

1) Number of HCP views in total and by location (i.e. screens or via PDR Solutions or not)
2) Number of HCP distributions to patients with confirmed eRx sent;
3) Number of eCoupon Redemptions and Adjudications, when available to OptimizeRx;
4) Prescriber Information (NPI, Specialty, etc.), when available to OptimizeRx and OptimizeRx is legally permitted to provide; and
5) Number of Non-billable events (i.e. eRx not confirmed sent, coupon de-selected)

Additionally, OptimizeRx can, upon request and upon mutual agreement as to pricing and metrics/definitions, provide additional custom reporting, including the above by geography and patient type, including by age/gender/first time prescription, and live access to real-time reporting.

SCHEDULE B

## SCHEDULE C

### Fees

**Fees to be paid to OptmizeRx:**

The following are the shares of Net Revenue payable to OptimizeRx as a result of programs and transactions in the PDRN Distribution Channels:

1. PDRN will pay OptimizeRx 30% of Net Revenues if the sales are to OptimizeRx Customers. For example:

   Revenue (net of partner share):      $5.00
   30% Net Revenue to OptimizeRx        $1.50
   Net Revenue retained by PDRN         $3.50

2. PDRN will pay OptimizeRx an additional 30% of Net Revenue if the sales are to OptimizeRx Customers and the transactions occur in the OptimizeRx Distribution Channels. For example:

   Revenue (net of partner share):      $5.00
   60% Net Revenue to OptimizeRx        $3.00
   Net Revenue retained by PDRN         $2.00

**Fees to be paid to PDRN:**

The following are the shares of Net Revenue payable to PDRN as a result of programs and transactions in the OptimizeRx Distribution Channels:

1. OptimizeRx will pay PDRN 30% of Net Revenues if the sales are to PDRN Customers. For example:

   Revenue (net of partner share):      $5.00
   30% Net Revenue to PDRN              $1.50
   Net Revenue retained by OptimizeRx   $3.50

2. OptimizeRx will pay PDRN an additional 30% of Net Revenue if the sales arc to PDRN Customers and the transactions occur in the PDRN Distribution Channels. For example:

   Revenue (net of partner share):      $5.00
   60% Net Revenue to PDRN              $3.00
   Net Revenue retained by OptimizeRx   $2.00

**General Terms regarding Fees:**

1. OptimizeRx Payment Terms and Reports. Within forty five (45) days following the end of each quarter, OptimizeRx will provide PDRN a report setting forth the amount of fees received from the manufacturer in the prior quarter resulting from PDRN platform, as calculated in accordance with this Agreement. OptimizeRx will deliver payment attributable to receipts from the prior quarter with such report.

SCHEDULE C

2.  <u>PDRN Payment Terms and Reports</u>.  Within  forty five (45) days following the end of each quarter, PDRN will provide OptimizeRx a report setting forth the amount of fees received from the manufacturer in the prior quarter resulting from OptimizeRx platform, as calculated in accordance with this Agreement.  PDRN will deliver payment attributable to receipts from the prior quarter with such report.

3.  <u>Pricing</u>.  Pricing for a party's services sold by the other party will be subject to the service owner party's approval; provided however, that such approval shall not be used in a way to limit the right to sell.  As of the date of this agreement, the agreed pricing for all PDRN services are set forth on <u>Confidential Exhibit A</u>, and the agreed pricing for all OptimizeRx services are set forth on <u>Confidential Exhibit B</u>.  Notwithstanding the foregoing pricing, the parties agree to revisit pricing on a case-by-case basis should pricing pressures occur in the market (e.g. clients will only accept cost per acquisition pricing on adjudications only or a hybrid model where payment is lower than anticipated for distribution, but higher for adjudication).

SCHEDULE C

## SCHEDULE D

### Service and Support Obligations

OptimizeRx shall provide support and maintenance to PDRN and end users including for API links. End User Information transfer and web service messaging with maximum 1-second response time for any SMD web service call. Support and maintenance includes providing phone assistance support and referring end users directly to PDRN 24 hours a day, 7 days a week. OptimizeRx shall provide a staff of sufficiently trained personnel to provide the support services contemplated under this Section.

OptimizeRx shall (a) respond to end user requests including those related to the OptimizeRx Solutions as described in this Schedule D; (b) provide call center support to physicians and pharmacies with respect to use of the OptimizeRx Solutions in accordance with OptimizeRx's standard support practices, which shall include at a minimum three full-time equivalent positions, and (c) provide ongoing technical support to PDRN.

OptimizeRx shall have planned down time, which shall be (i) any period outside of the hours of 9:00 am to 9:00 pm EST Monday through Friday and 8:00 am to 5:00 pm EST Saturday and Sunday, and holidays for which OptimizeRx gives at least forty-eight (48) hours notice that the Service will be unavailable; and (ii) down time caused by circumstances beyond OptimizeRx's reasonable control, including without limitation, acts of God, acts of government, flood, fire, earthquakes, civil unrest, acts of terror, strikes or other labor problems, telecommunications failures or delays, computer failures involving hardware or software not within OptimizeRx's possession or reasonable control and acts of vandalism (including network intrusions and denial of service attacks), but only if such unavailability results notwithstanding the exercise of reasonable care and diligence to avoid or mitigate the same in anticipation of or in response to such causes. Customer is solely responsible for providing, at its own expense, all network access to the Service, including, without limitation, acquiring, installing and maintaining all telecommunications equipment, hardware, software and other equipment as may be necessary to connect to, access and use the Service.


SERVICE LEVELS

OptimizeRx shall meet the Service Levels attached in Schedule E.

**SCHEDULE E**

**Service Levels**

| | Priority Definition | AVERAGE RESPONSE TIME & RESOLUTION SET |
|---|---|---|
| Priority 1 | Incident or Problem affecting a high percentage of customers and/or Applications/hardware critical to the business function for which work cannot continue until the problem is fixed and/or severe risk to the environment that could potentially impact critical service delivery | FIRST RESPONSE= 15 MINUTES-full downtime procedures<br><br>**ATTEMPTEDRESOLUTION OR PLAN=4 HOURS (24 hr. clock)** |
| Priority 2 | The incident or problem has a work around however, the use of the available workaround would have major impact on operations or business flow if continued beyond 24 hours from the time the call is received. | FIRST RESPONSE= 30 minutes full downtime procedures<br><br>**ATTEMPTED RESOLUTION OR PLAN=8 business HOURS (24 hr. clock)** |
| Priority 3 | The incident or problem has a workaround available and the user is still able to perform his/her function with minimal impact on operations or business flow. | FIRST RESPONSE= 4 business hrs.-<br><br>**ATTEMPTED RESOLUTION OR PLAN=2 business days** |
| Priority 4 | Low Request for support, service or product of standard desktop applications affects a limited number of users and does not impact operations or business flow. The user has an acceptable workaround. | FIRST RESPONSE= 8 business hrs. -<br><br>**ATTEMPTED RESOLUTION OR PLAN=5 business days** |

**SCHEDULE E**

**CONFIDENTIAL EXHIBIT A**

**PDRN Confidential Information**

I.     **Services Pricing**

II.    **PDRN Customers**

III.   **PDRN EHR Partners**

[PDRN to provide.]

CONFIDENTIAL EXHIBIT A

**CONFIDENTIAL EXHIBIT B**

**OptimizeRx Confidential Information**

**I.**     **Services Pricing**

**II.**    **OptimizeRx Customers**

**III.**   **OptimizeRx EHR Partners**

[OptimizeRx to provide.]

CONFIDENTIAL EXHIBIT B

# EXHIBIT B

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

OPTIMIZERX CORPORATION,
a Nevada Corporation,

      Plaintiff,

-vs-

LDM GROUP, LLC; and
PDR NETWORK, LLC, corporate
successor to LDM Group

      Defendants.

_____/

Civil Action No.:

Hon.

JOSEPH P. MCGILL (#43770MI)
Foley, Baron, Metzger & Juip, PLLC
*Attorneys for Plaintiff*
38777 Six Mile Road, Suite 300
Livonia, MI  48152
(734) 742-1800
Email: jmcgill@fbmjlaw.com

_____/

### VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL

    NOW COMES Plaintiff OPTIMIZERX CORPORATION, and for its Complaint

against Defendants LDM Group, LLC and PDR Network, LLC, hereby states as follows:

### Parties and Introduction

    1.    Plaintiff OptimizeRx Corporation ("OPRx" or "OptimizeRx") is a corporation

organized under the laws of the State of Nevada, with its principal place of business in

the City of Rochester, County of Oakland, State of Michigan.

2.     LDM Group, LLC is a limited liability company organized and existing under Missouri law with its registered office address at 12935 North Outer Forty, Suite 210, St. Louis, Missouri 63141.

3.     Upon information and belief, on or about November 3, 2014, LDM Group merged with PDR Network, LLC.

4.     PDR Network, LLC is a Delaware limited liability company with its principal place of business at 5 Paragon Drive, Montvale, New Jersey 07645.

5.     Upon information and belief, PDR is the corporate successor of LDM and, as a result, is bound by the terms of the various agreements referenced herein and liable for the breach thereof.  Contrary to its obligations under the agreement referenced herein, LDM Group has not supplied any written notification of assumption of its obligations by any successor or assignee; as such, PDR is included as a necessary party and for its active involvement as detailed herein below.    (Confidential Settlement Agreement at ¶12).

### Jurisdiction and Venue

6.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §1332(a) because this is a civil action between citizens of different states and the amount in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs.

7.     There is complete diversity between the parties because Plaintiff is organized under the laws of the State of Nevada and Defendants LDM and PDR are organized under the laws of the States of Missouri and Delaware, respectively.

## Background

8.     LDM Group previously sued the Michigan OptimizeRx Corporation for infringement of U.S. Patent No. 8,121,868 and sought money damages and injunctive relief in Civil Action No. 4:12CV02043 filed in the U.S. District Court for the Eastern District of Missouri.  See Exhibit A.

9.     While that matter was pending, on February 26, 2013 LDM and OPRx entered into a confidential Settlement and Patent License Agreement resolving the issues alleged in the 2012 litigation.

10.     On that same day, February 26, 2013, PDR and OPRx also entered into a Master Services Agreement which granted a limited license of the technology at issue and provided the frame-work for the joint marketing of eCoupons (as referred to therein) and patient education services.[1]

11.     Subsequent to the agreements, the 2012 litigation filed by LDM against OPRx was voluntarily dismissed on March 7, 2013.

12.     Upon OPRx requesting implementation of agreed terms contained in the Settlement and Patent License Agreement and the MSA, LDM Group once again sued OptimizeRx (and the Michigan OptimizeRx Corporation) for infringement of U.S. Patent No. 8,121,868 and 8,533,004 and sought rescission, money damages on account, and injunctive relief to stop and remedy OptimizeRx's alleged patent infringement in Civil Action No. 4:13CV0773 filed in the U.S. District Court for the Eastern District of Missouri.  See Exhibit B.

---

[1] Since PDR is the corporate successor of LDM Group, LLC, PDR is in possession of the 2013 OPRx/LDM Master Services Agreement and, as a result, it is not attached hereto.

13.     On February 28, 2014, Mark Heinold, CEO of LDM Group, LLC

(hereinafter "LDM") signed a certain Confidential Settlement Agreement and Mutual

Release (hereinafter "Confidential Settlement Agreement").[2] In that document, LDM and

OPRx made a number of promises to one another for purposes of a mutually beneficial

promotion of services within each entity's group networks of EHR, EMR or E-prescribers

for purposes of marketing and sales of eCoupons, patient discount services and patient

education.

14.     Civil Action No. 4:13CV0773 was jointly dismissed with prejudice as to the

claims existing on or about March 18, 2014; however, the Agreement has been

breached by LDM, causing damage to OPRx.

15.     OPRx has fully complied with its obligations under the Confidential

Settlement Agreement, including but not limited to payments currently totaling

$900,000.00 to LDM in reliance upon the mutual rights and obligations contained

therein. LDM has persistently failed to discharge its obligation under the Confidential

Settlement Agreement, and has caused damage to OPRx.

16.     The Confidential Settlement Agreement provides in pertinent part at

Paragraph 3(c)(i-iv) that OPRx is allowed to distribute the OPRx patient discounts within

LDM's group network of EHR, EMR, or E-prescribers for a fee, subject to certain

exceptions that are not present in this case nor are they alleged.

17.     Further, Paragraph 3(c)(4) affirmatively states in pertinent part that ". . .

LDM Group will not take affirmative actions to stop any EHR, EMR, or E-prescriber from

---

[2] For purposes of confidentiality and due to the fact that LDM is in possession of the subject
Confidential Settlement Agreement the document is not attached hereto but will be made
available to Court personnel as requested and presumably after an appropriate order sealing
the document is entered by this Court.

doing business with OPRx for the purpose of preventing OPRx's use of LDM Group's network." LDM has an affirmative duty to inform OPRx of the rejection or disapproval of the OPRx patient discount by any EHR, EMR or e-prescriber in the LDM network via written notice to OPRx. (Confidential Settlement Agreement at paragraph 3(c)(i)(1)). To date, it has failed to do so.

18.    In spite of its obligations under the Confidential Settlement Agreement, LDM has not allowed OPRx to distribute OPRx's available eCoupons and patient discount services within the LDM Group network, except on a very limited basis in violation of the objective of the terms thereof.

19.    LDM has misinformed at least two pharmaceutical companies that it would not be accepting OPRx's SampleMD programs. LDM has also stated this to the brands that OPRx currently manages and from whom OPRx was in the process of securing approvals for integration of LDM. As a result of this conduct, significant revenues were lost, causing damage to OPRx.  Such conduct is completely contrary to LDM's clear obligation to allow OPRx to promote its eCoupons and patient discount services as noted in paragraph 3(c)(iv) of the Agreement.

20.    LDM failed to implement the mutually agreed integration to fully promote LDM's and OPRx's programs. Such integration is essential to maximize revenue share (to both parties), and is also essential to LDM's and OPRx's joint agreement to promote OPRx programs in network and as new networks are identified and signed.

21.    Specific instances of LDM's failure to implement include the following:

**Integration of OPRx simplified requested web-services into LDM**

(a)     Following execution of Settlement Agreement, OPRx and LDM
        discussed the integration of the solutions at an eRx conference in
        March of 2014, which resulted in OPRx sending LDM the
        integration guide and web service requirements.

(b)     In May 2014, LDM sent OPRx its "Go Live" Checklist.  Task Orders
        and integration forms were developed accordingly for program
        launches.

(c)     In June 2014, LDM and OPRx reviewed work/data flow for
        integration and addressed the concern for the coupon assets –
        including time for LDM setup.

(d)     On June 26, 2014, LDM and OPRx finalized the agreed steps for
        co-promotion of sampleMD's eCoupon within the LDM network.
        This process included:

        (i)     issuing of Task Order;
        (ii)    sending associated rules;
        (iii)   sending assets in native format as received from the client;
        (iv)    OPRX to provide all "Link Information";
        (v)     LDM to provide "View Savings Offer" link;
        (vi)    LDM to make GetOffer call to OPRX when drug is selected
                by physican; and
        (vii)   LDM to return confirmation that the coupon was printed,
                electronic version sent to pharmacist or cancelled.

**Integration of OPRx simplified requested web-services into LDM**

(e)     OPRx received LDM confirmation (July 11, 2014) that after meeting
        with the LDM technical team, the integration effort would take two
        (2) sprints (a sprint is equal to 2 weeks), LDM admitted an 8-week
        window for pushing integration prior to mid-September 2014.

(f)     OPRx agreed to let LDM run the program independently while
        moving forward on integration of solutions (agreed on 3 programs:
        Aptiom, Stendra and Zorevolex).

(g)     OPRx received verbal notification from LDM that NextGen eCoupon
        offering was delayed to Q1 2015 – the integration effort by LDM
        was pushed back to end of Q4 2014 or Q1 2015.  No updates have
        been provided and LDM implied they have no intention of
        proceeding.

(h)    OPRx continued to request integration for other offerings and programs to be promoted within LDM.  To date LDM has refused to implement such integration.

**Performance of Initial launched first brands.**

(i)    LDM initiated only three (3) programs within its network (Aptiom, Stendra and Zorvolex) in June 2014 to a very limited portion of their network and did not supply the list of EHRs/EMRs/eRx platforms who had declined to participate as required under agreement in Sec. 3(C)(i)1.

(j)    All future programs were rejected or not implemented based on additional mandates outside of agreed parameters and contractual obligations, including but not limited to DSI, AstraZeneca and others that LDM committed to promoting.

(k)    LDM claims that very few of their partners would promote the OPRx programs – per the terms of the Settlement Agreement; OPRx requested to know which partners rejected, but again has not received any meaningful response to such inquiry.

(l)    OPRx requested reporting results from LDM to be on a monthly basis (initially weekly) but LDM would not accommodate OPRx reporting requirements (such requirements are generally imposed upon OPRx by its Pharma clients).

(m)    Within the initial first program's run, after nearly eight (8) months of promotions, LDM reported the following token performance within their claimed network of approximately 100,000 healthcare providers:

> Aptiom –     12 print
> Stendra –    65 prints
> Zorvolex –  178 prints

22.    On October 16, 2014, pursuant to paragraph 14 of the Confidential Settlement Agreement, OPRx provided notice of multiple substantive violations and/or non-compliance with the Agreement.  OPRx requested compliance with the Agreement, which LDM failed and/or refused to provide within the thirty (30) day time period agreed therein.  (See Exhibit C).

23.     LDM's conduct constitutes serious breaches of the Confidential Settlement Agreement and have caused and will continue to cause substantial damage to OPRx in an amount of at least $900,000.00, which continues to mount.

**COUNT I**
**BREACH OF CONTRACT**

24.     Plaintiff incorporates by reference the allegations contained in Paragraphs 1 through 23, as though set forth in full herein.

25.     LDM agreed to various terms consistent with the Confidential Settlement Agreement entered into between the parties.

26.     LDM has refused to comply with the terms of the Confidential Settlement Agreement, specifically including allowing OPRx access to LDM's Group Network of EHR, EMR and/or E-prescribers.

27.     Plaintiff has duly performed all of the terms of its obligations with Defendant, including but not limited to payments currently totaling $900,000.00 in fees detailed in the Confidential Settlement Agreement.

28.     LDM failed and refused to perform on said agreements and has refused to allow access to LDM's Group Network and/or refused to cooperate or participate in the due diligence efforts required to integrate LDM's patient education platform into the OPRx network.

29.     LDM has also failed to provide necessary information, including pricing and capabilities to enable OPRx to sell LDM patient education to their existing pharmaceutical customers that are not currently working with LDM directly.  In contrast, OPRx has been fully compliant to exclusively promoting and selling LDM services,

causing significant additional damages but have been restricted in its attempts to do so by LDM's conduct.

30.    LDM has misrepresented to current OPRx clients that they must work directly with LDM to promote savings programs within the LDM network and that SampleMD/OPRx programs would not be accepted in violation of paragraph 3(c)(iv) of the Settlement Agreement.

31.    In contrast to its obligations under the Settlement Agreement, LDM has been touting its access to OPRx programs to new and existing network platforms in order to expand its network and gain competitive advantage over OPRx through unlawful means.  LDM thereafter refused  to allow promotion of OPRx programs after such network platforms have been acquired.

32.    LDM has enjoyed the benefits of Plaintiff's performance of its obligations pursuant to the Confidential Settlement Agreement and now refuses to cooperate with the integration necessary to implement the Agreement.

33.    LDM's conduct constitutes serious breaches of the Confidential Settlement Agreement and have caused and will continue to cause substantial damage to OPRx in the form of lost revenue in an amount not less than $900,000.00 paid thus far to the merged entity, and loss of business valuation in an amount not less than $10 million, which continues to mount.

## COUNT II
## TORTIOUS INTERFERENCE

34.    Plaintiff incorporates by reference the allegations contained in Paragraphs 1 through 33 as though fully set forth herein.

35.     OPRx had previously entered in a settlement agreement that LDM refused to comply with and thus resulting in LDM filing another lawsuit.

36.     OPRX had an existing and/or reasonable expectation of an economic benefit or advantage arising from its Confidential Settlement Agreement with LDM related to the sales of prescription discount services to customers and/or partners of LDM/PDR and its distribution network.

37.     LDM had knowledge of OPRx's expectancy to receive mutual benefits and incremental revenue by operation of the terms agreed.

38.     LDM wrongfully and intentionally interfered with such expectations by committing the following non-exhaustive list of unlawful acts:

(a)     Both merged parties have violated and continue to violate existing agreements with OPRx.

(b)     Misrepresenting and violating the agreement by informing pharmaceutical companies that OPRx and SampleMD programs would not be accepted in its network in an effort to directly divert business away from OPRx;

(c)     In contrast to above item (a),PDR has misrepresented to eRx, EMR/EHR platforms that SampleMD (OPRx) programs will be available through LDM/PDR, only to circumvent and exclude OPRx from directly or indirectly promoting programs through these platforms; and

(d)     LDM and the CEO of the merged entity have previously entered into agreements with OPRx and similarly refused to comply with the agreed terms. This continual pattern of non-compliance and misrepresentation has caused significant damage to OPRx in both instances.

39.     It is reasonably probable that OPRx would have received an economic benefit in the form of increased revenue and business valuation in the absence of LDM's unlawful interference.

10

40.    LDM is without justification for causing the intentional interference with OPRx's valid business expectations.

41.    LDM's conduct constitutes serious breaches of the Confidential Settlement Agreement and have caused and will continue to cause substantial damage to OPRx in the form of lost revenue in an amount not less than $900,000.00 paid thus far to the merged entity, and loss of business valuation in an amount not less than $10 million, which continues to mount.

**COUNT III**
**CIVIL CONSPIRACY**

42.    Plaintiff incorporates by reference the allegations contained in Paragraph 1 through 41 as though fully set forth herein.

43.    Defendant LDM entered into an agreement with PDR Network on or before November 3, 2014.

44.    LDM and PDR Network entered into such an agreement for purposes of committing an unlawful act, specifically the breach and/or violation of the PDR Master Services Agreement and/or the LDM Confidential Settlement Agreement.

45.    LDM had a meeting of the minds with PDR Network for purposes of carrying out its civil conspiracy against OPRx.

46.    Both LDM and PDR Network Group took at least one overt act in furtherance of such agreement including but not limited to the merger of LDM Group into PDR on or about November 3, 2014.  Additional overt acts include, but are not limited to the following:

(a)    Both merged parties have violated and continue to violate existing agreements with OPRx.

(b)     Misrepresenting and violating the agreement by informing pharmaceutical companies that OPRx and SampleMD programs would not be accepted in its network in an effort to directly divert business away from OPRx;

(c)     In contrast to above item (a), PDR has misrepresented to eRx, EMR/EHR plaforms that SampleMD (OPRx) programs will be available through LDM/PDR, only to circumvent and exclude OPRx from directly or indirectly promoting programs through these platforms; and

(d)     LDM and the CEO of the merged entity have previously entered into agreements with OPRx and similarly refused to comply with the agreed terms. This continual pattern of non-compliance and misrepresentation has caused significant damage to OPRx in both instances.

47.     LDM's conduct constitutes serious breaches of the Confidential Settlement Agreement and have caused and will continue to cause substantial damage to OPRx in the form of lost revenue in an amount not less than $900,000.00 paid thus far to the merged entity, and loss of business valuation in an amount not less than $10 million, which continues to mount.

## REQUEST FOR RELIEF

**WHEREFORE,** Plaintiff requests that judgment be entered against Defendants as follows:

(a)     Damages which continue to mount  including lost revenue of $900,000.00 and loss of business past and future in the amount of at least $10 million; or, in the alternative,

(b)     Specific performance of the terms of the Settlement Agreement; and

(c)     A permanent injunction to ensure:

i.      That LDM proceed in good faith to complete the necessary steps, including completion of the agreed integration, to enable OPRx to distribute its patient discounts within LDM's group network.

ii.     That LDM accept all of OPRx's programs for promotion unless one of the exceptions set out in Paragraph 3 applies. If they are alleged to apply, LDM must give OPRx the full facts and information underlying the exception.

iii.    That LDM provide OPRx written notice for each EHR, EMR or E-prescriber that rejected or disapproved of the patient discount, if in fact they exist.

iv.     That LDM immediately cease and desist claiming that SampleMD or OPRx will not be accepted in the LDM program and provide written documentation that this was communicated to all sales and marketing personnel.

v.      That LDM complete the integration of their platform with OPRx by a date to be determined by this Honorable Court.

vi.     That LDM facilitate the OPRx promotion within its network.

vii.    That LDM cooperate in good faith to the greatest extent feasible with OPRx's effort to integrate LDM promotional programs within OPRx's network.

**(d)**     Any other relief this Honorable Court deems equitable and just.


Respectfully submitted,

FOLEY, BARON, METZGER & JUIP, PLLC


Dated:  March 20, 2015                    By:  /s/Joseph P. McGill
                                          Joseph P. McGill (P43770)
                                          *Attorneys for Plaintiff*
                                          38777 Six Mile Road, Suite 300
                                          Livonia, Michigan  48152
                                          (734) 742-1825
                                          Email:  jmcgill@fbmjlaw.com

PLAINTIFF: OPTIMIZERX CORPORATION

By:_____

Its: Chief Financial Officer

14

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION


OPTIMIZERX CORPORATION,
a Nevada Corporation,

      Plaintiff,

                                  Civil Action No.:

-vs-

                                  Hon.

LDM GROUP, LLC; and
PDR NETWORK, LLC, corporate
successor to LDM Group

      Defendants.
_____/

## JURY DEMAND

      NOW COMES Plaintiff, by its attorneys, Foley, Baron & Metzger, PLLC, and

hereby demands a jury of the above-captioned matter.


                    Respectfully submitted,

                    FOLEY, BARON, METZGER & JUIP, PLLC


Dated:  March 20, 2015        By:  /s/Joseph P. McGill _____
                        Joseph P. McGill (P43770)
                  *Attorneys for Plaintiff*
                  38777 Six Mile Road, Suite 300
                  Livonia, Michigan  48152
                  (734) 742-1825
                  Email:  jmcgill@fbmjlaw.com